CHIEF OF POLICE OF DRACUT *vs.* TOWN OF DRACUT & others.

Middlesex.    December 2, 1969. — May 11, 1970.

Present: SPALDING, CUTTER, SPIEGEL, REARDON, & QUIRICO, JJ.

*Statute*, Revocation of acceptance, General law.  *Constitutional Law*, "Home Rule Amendment," General law, Municipalities.  *Police*. *Municipal Corporations*, "Home rule," Police, Collective bargaining.

G. L. c. 41, § 97A, is a general law within the powers reserved to the General Court by art. 89 of the Amendments to the Massachusetts Constitution and G. L. c. 43B, the Home Rule Procedures Act, and, there being no statute authorizing a municipality which has accepted c. 41, § 97A, to revoke its acceptance, a vote of a town to rescind its earlier acceptance thereof was a nullity. [497–498]

The selectmen of a town in which G. L. c. 41, § 97A, is in effect and its chief of police each have a measure of authority over the police department. [499]

In an agreement under G. L. c. 149, §§ 178G–178N, between a town in which c. 41, § 97A, was in effect and the collective bargaining agent for the members of its police department, articles which impinged upon the power and authority of the chief of police to decide duty, vacation and leave assignments of the police officers were null and void. [502]

An article of a collective bargaining agreement under G. L. c. 149, §§ 178G–178N, between a town in which G. L. c. 41, § 97A, was in force and the bargaining agent for the members of its police department, pro-

viding in substance that regulations governing the department made by the chief of police should not be effective without the selectmen's approval in circumstances in which § 97A prescribed to the contrary, and an article in direct conflict with the chief's authority under § 98 to determine what weapons police officers should carry, were void. [502–503]

The selectmen of a town in which G. L. c. 41, § 97A, was in effect properly agreed to articles in a collective bargaining agreement under c. 149, § 178G–178N, with the bargaining agent of the members of its police department providing that the agent would be furnished with the complete records of "all overtime and sick leave accumulation" maintained by the chief of police and that the "assignments to shifts" should be posted in the police station [503]; the selectmen properly agreed also to an article in the agreement that police officers should be granted leaves of absence without pay for any reasonable purpose for a limited period once every five years or more than once in the "discretion of [the] employer," but such article would be subject to the sole authority of the chief as to when such leaves would be granted, how many officers would be permitted to be on leave at any one time, and whether any officer should have more than one leave within five years [503–504].

Under the authority given to a municipal employer by G. L. c. 149, § 178H, to bargain and contract with a collective bargaining agent of municipal employees as to "wages, hours and other conditions of employment," the selectmen of a town in which c. 41, § 97A, was in force were authorized to include in a collective bargaining contract with the bargaining agent of the members of its police department a procedure for processing grievances arising solely under the contract itself; the contract, however, could not require that such procedures be applied to alleged grievances arising from any action which the chief of police was authorized to take under § 97A. [504]

BILL IN EQUITY filed in the Superior Court on November 16, 1967.

The suit was heard by *Ponte,* J.

*Philip S. Nyman* for the Dracut Police Relief Association, Inc.

*Edward J. Owens,* Town Counsel, for the Town of Dracut & another.

*Edward R. Lembo* for the plaintiff.

QUIRICO, J. This is a suit in equity brought by Wilfred Paquette (chief) in his official capacity as the chief of police of the town of Dracut (town), against the town, its board of selectmen (selectmen) and the Dracut Police Relief Association, Inc. (association), to determine and declare certain rights of the chief and the selectmen respectively in the government and operation of the town's police department.

The suit has arisen because the selectmen negotiated and executed a collective bargaining agreement (agreement) between the town and the association, the collective bargaining employee organization for the members of the police department. The chief alleges that the agreement contains provisions which go beyond the authority given to the selectmen by G. L. c. 149, §§ 178G–178N, inserted by St. 1965, c. 763, § 2, as amended through St. 1969, c. 341; and that it infringes upon his exclusive authority under G. L. c. 41, § 97A, as appearing in St. 1948, c. 595. The case is before us on the appeals of all the defendants from the final decree of the Superior Court substantially upholding the contentions of the chief and enjoining all of the defendants from acting under, enforcing or implementing certain provisions of the agreement.

The case was submitted to the trial judge for decision as a case stated. G. L. c. 231, § 126. *Stuart* v. *Sargent*, 283 Mass. 536, 541. *Murphy* v. *Boston*, 337 Mass. 560, 561. The facts agreed upon are those alleged by the plaintiff in his bill and admitted by the defendants in their answers, plus certain other facts stated by counsel in open court and entered in the transcript of the hearing. The relevant facts thus agreed upon are set forth in the following paragraphs to the extent necessary for the purposes of this opinion.

On March 7, 1955, the town accepted G. L. c. 41, § 97A,[1]

---

[1] "In any town which accepts this section there shall be a police department established by the selectmen, and such department shall be under the supervision of an officer to be known as the chief of police. The selectmen of any such town shall appoint a chief of police and such other officers as they deem necessary, and fix their compensation, not exceeding, in the aggregate, the annual appropriation therefor. In any such town in which such appointments are not subject to chapter thirty-one, they shall be made annually and the selectmen may remove such chief or other officers for cause at any time after a hearing. The chief of police in any such town shall from time to time make suitable regulations governing the police department, and the officers thereof, subject to the approval of the selectmen; provided, that such regulations shall become effective without such approval upon the failure of the selectmen to take action thereon within thirty days after they have been submitted to them by the chief of police. The chief of police in any such town shall be in immediate control of all town property used by the department, and of the police officers, whom he shall assign to their respective duties and who shall obey his orders. Section ninety-seven shall not apply in any town which accepts the provisions of this section. Acceptance of the provisions of this section shall be by a vote at an annual town meeting."

and thereafter operated its police department under the
provisions of that law until the occurrence of the events
hereinafter described. On May 31, 1967, the association
informed the selectmen by letter that it had secured sig-
natures from ninety-five per cent of the members of the
town's police department designating it as their exclusive
bargaining agent, and it requested the selectmen to recog-
nize the association as the exclusive collective bargaining
agent for the members of the police department. The
selectmen granted that request on July 27, 1967. On
August 1, 1967, they wrote to the chief designating him as
their representative for negotiations with the association.
On the same date the chief sent the selectmen a letter stating
that he would not serve as their representative for such
negotiations, and he did not serve.

Thereafter the selectmen personally conducted negotia-
tions with representatives of the association on the terms
of a proposed collective bargaining agreement between the
town and the association. On October 26, 1967, the town,
acting through its selectmen, and the association, acting
through its officers, signed a collective bargaining agreement
incorporating the terms negotiated by them prior to Oc-
tober 16, 1967, and containing the provisions which the
chief contends are invalid.

After the completion of the negotiations but before the
execution of the agreement, a town meeting was held on
October 16, 1967. At that meeting it was voted "that the
Town rescind the provisions of Section 97A of Chapter 41,
of the General Laws relative to the establishment of Police
Departments in certain towns accepted under Article 47 of
the Annual Town Meeting of March 7, 1955, and to accept
in place thereof the provisions of Section 97 of Chapter 41
of the General Laws, which is an Act relative to the estab-
lishment of Police Departments in certain towns [quoting
the text of this section]." The principal difference between
the two sections is that, under § 97, "[t]he selectmen may
make suitable regulations governing the police department
and the officers thereof"; whereas under § 97A "[t]he chief

of police . . . shall from time to time make suitable regulations governing the police department, and the officers thereof, subject to the approval of the selectmen [and in some circumstances without such approval]." The latter section also provides that the chief of police "shall be in immediate control of all town property used by the department, and of the police officers, whom he shall assign to their respective duties and who shall obey his orders."

One basic question to be decided in this case is whether the action of the town meeting of October 16, 1967, operated as a rescission of its earlier acceptance of G. L. c. 41, § 97A, on March 7, 1955. Section 97A provides for its acceptance "by a vote at an annual town meeting," but it contains no provision permitting a town to rescind its acceptance thereof. It has been the law that "[i]n the absence . . . of some indication in the language, the form, or the subject matter of a particular statute enacted subject to local acceptance, that an acceptance once given may be revoked, the effect of a valid acceptance by a city or town is to make the statute operative in that community until the statute is repealed or amended. Once the condition precedent stipulated by the Legislature to the taking effect of the statute in the community is satisfied, it becomes applicable statute law, subject to change, as in the case of other statutes, only by subsequent action of the Legislature." *Brucato* v. *Lawrence,* 338 Mass. 612, 615–616. See *Donnelly* v. *Dover-Sherborn Regional Sch. Dist.* 341 Mass. 497, 500, fn.; *Oleksak* v. *Westfield,* 342 Mass. 50, 52–53; *McDonough* v. *Lowell,* 350 Mass. 214, 216.

The town and its selectmen concede that if this is still the law then the town was without authority to rescind its prior acceptance of § 97A. They contend on appeal, however, that the material changes made in art. 2 of the Amendments to the Constitution of the Commonwealth by art. 89 of the Amendments, commonly and herein referred to as the Home Rule Amendment, ratified on November 8, 1966, render this rule obsolete.

It is not clear that the effect of the Home Rule Amend-

ment is open on the record before us. Although this case was entered more than one year after its ratification, there is no reference to it in any of the pleadings. Nor is there any reference to it in the trial judge's decision. If this question is now open, we think it is without merit. Section 8 of the Home Rule Amendment expressly provides that "[t]he general court shall have the power to act in relation to cities and towns, but only by general laws which apply alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two . . . ." The same limitation appears in § 6 of the Home Rule Amendment which provides in part that "Any city or town may, by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it, *which is not inconsistent with the* constitution or *laws enacted by the general court in conformity with powers reserved to the general court by section eight* . . ." (emphasis supplied). General Laws c. 43B, inserted by St. 1966, c. 734, § 1, and entitled the Home Rule Procedures Act, was enacted to implement the Home Rule Amendment. Section 13 of this act repeats substantially all the language of § 6 of the Home Rule Amendment, and in addition thereto it provides in part that "[n]othing in this section shall be construed to permit any city or town, by ordinance or by-law, to exercise any power or function which is inconsistent with any general law enacted by the general court before November eighth, nineteen hundred and sixty-six which applies alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two."

General Laws c. 41, § 97A, is such a general law, and the fact that a town has the option whether or not to adopt it does not change its character. It therefore falls within the powers reserved to the General Court by the Home Rule Amendment and by the Home Rule Procedures Act. In enacting the Home Rule Procedures Act (G. L. c. 43B) the Legislature included no grant of authority to municipalities to rescind, by unilateral action, their prior acceptance of any provision of the General Laws. That omission may reflect

the Legislature's concern that if municipalities had unbridled authority to rescind prior acceptance of basic provisions of the General Laws by unilateral action, there might result frequent and precipitous changes in the administration of municipal affairs which might produce chaos, all contrary to the public interest. Consequently, we hold that the Home Rule Amendment and the Home Rule Procedures Act do not render inoperative the rule laid down in *Brucato* v. *Lawrence, supra.*[2] Thus, the vote of the town meeting on October 16, 1967, to rescind the town's earlier acceptance of G. L. c. 41, § 97A, was a nullity. The operation of the town's police department is therefore still governed by § 97A, and not by § 97. The trial judge's similar conclusion was correct.

Turning now to a consideration of the respective roles of the selectmen and the chief under § 97A, it is clear that both have some authority with respect to the police department. The selectmen establish the department, appoint "a chief of police and such other officers as they deem necessary, and fix their compensation." The chief is authorized to "make suitable regulations governing the police department, and the officers thereof, subject to the approval of the selectmen" but his regulations become effective without approval if the selectmen do not act on them within thirty days after they are submitted to them. The chief is "in immediate control of all town property used by the department, and of the police officers, whom he shall assign to their respective duties and who shall obey his orders." In contrast, under G. L. c. 149, §§ 178G–178N, the selectmen alone, acting as the "chief executive officer[s]" of the municipal employer (§ 178I) are given authority to engage in collective bargaining negotiations with town employees, including members of the police department, with respect to

---

[2] We are not now dealing with the recognized power of a city which has accepted one of the standard forms of charters permitted by G. L. c. 43 to adopt a different form of standard charter under c. 43, thereby impliedly nullifying its earlier acceptance of the first form of charter, all without the necessity of any special act of the General Court. Art. 89 of Amendments, § 8. G. L. c. 43, §§ 6 through 13; and c. 43B inserted by St. 1966, c. 734, § 1.

"wages, hours and other conditions of employment." They alone are also given authority to "execute a written contract incorporating any agreement reached." Section 178I which expressly gives the selectmen such authority states that "[i]n the event that any part or provision of any such agreement is in conflict with any law, ordinance or by-law, such law, ordinance or by-law shall prevail so long as such conflict remains."[3]

"In meeting the problem of fitting . . . [G. L. c. 149, §§ 178G–178N] into the statutes we are aided by various rules in the nature of axioms. Some meaning, if possible, must be given the later legislation. In its enactment the Legislature presumably knew the existing statute [G. L. c. 41, § 97A] . . . . All the statutes must be construed, where capable, so as to constitute a harmonious whole consistent with the legislative purpose disclosed in the new act. Such purpose is to be gleaned from the reasons, where ascertainable, leading to the legislation, from the nature of the subject matter, from the supposed evil to be corrected, and from the objective sought to be attained." *Mathewson* v. *Contributory Retirement Appeal Bd.* 335 Mass. 610, 614–615. *Bolster* v. *Commissioner of Corps. & Taxn.* 319 Mass. 81, 84–85. *Milton* v. *Metropolitan Dist. Commn.* 342 Mass. 222, 225. *Atlas Distrib. Co.* v. *Alcoholic Beverages Control Commn.* 354 Mass. 408, 414.

The several statutes involved in this case do not compel a conclusion that the total authority over the town's police department is vested in either the chief or in the board of selectmen. They give a measure of authority to each. The later statute on collective bargaining realistically recognizes in § 178I that the selectmen's authority to negotiate and con-

---

[3] Since the trial of this case § 178I was amended by St. 1969, c. 341, which inserted at this point in the statute the following language: "provided, however, that the provisions of any such agreement shall prevail over any regulation made by a chief of police pursuant to section ninety-seven A of chapter forty-one." This amendment does not affect this case because the record does not show that there are any regulations made by the chief of police pursuant to § 97A now in effect. It does not appear whether the chief has ever made any such regulations, nor does it appear whether regulations, if any, made by him have been disapproved by the selectmen.

tract on the subject matter of "wages, hours and other conditions of employment" in some instances may overlap or conflict with the authority of the chief under the earlier statute, § 97A, to make "suitable regulations governing the police department, and the officers thereof" and to assign police officers to their respective duties. That is why § 178I says that if the agreement thus negotiated "is in conflict with any law, ordinance or by-law, such law, ordinance or by-law shall prevail."

The chief contends that articles 4, 5, 7, 11 (par. 2 through end), 12 (pars. 2 and 3), 16, 17, 18 and 19, of the collective bargaining agreement are null and void because they violate or conflict with G. L. c. 41, § 97A, and his powers thereunder, or because they go beyond the scope of the selectmen's authority which is limited to negotiating "with respect to wages, hours and other conditions of employment." The trial judge found and ruled in favor of the chief as to all of the disputed articles of the agreement. Certain of the articles involve a common question, and we shall therefore consider them by groups rather than individually.

Most of the disputed articles require that the chief give exclusive consideration to the individual request, personal preference, seniority and rank of a police officer in determining assignment of duties, shifts, vacations and leaves of absence.[4]  It is probably the practice for chiefs of police

---

[4] The language of these disputed articles, or parts thereof, follows: "*Article 4.*  Each employee shall be granted special leave with pay for a day on which he is able to secure another employee to work in his place provided: (A) Such substitution does not impose any additional cost on the town. (B) The Chief of Police or his representative shall be notified on an appropriate form not less than one day prior to its becoming effective, except in the case of emergency, notification may be made by telephone.  (C) Neither the Department nor the Town is held responsible for enforcing any agreements made between employees.  (D) Officer in Charge of shifts approves the change." "*Article 7.  Leave of Absence Without Pay:* One leave of absence for limited period not to exceed one (1) month shall be granted for any reasonable purpose, and such leaves shall be extended or renewed up to 90 days; the total to include first month.  Only one leave every five (5) years except at discretion of employer.  Number of men on leave at one time is to be at discretion of employer.  Reasonable purpose in each case shall be agreed upon by the Association and the Employer." "*Article 11.  Seniority:* . . . (2) Part Time Employees a. Must be worked according to seniority on rotating basis from top to bottom of list; on refusal by any member he shall return to the bottom of list.  (3) Outside Details (Except Clubs and Organizations) a. To start by

to consider such personal factors in making such decisions, and to honor them if reasonable, practicable and consistent with the public interest and proper functioning of the police department. But, the fact that the chief, in his discretion, may consider these factors in making such decisions is very different from a contractual obligation that he be bound by such factors. Such a contractual obligation may not be uncommon in a collective bargaining agreement made by a private employer with his employees; but private employers

---

rank and seniority with the Captain through the Lieutenant, and the Sergeants to the Patrolmen through the intermittent list to the bottom and start all over again at the top; except on special request by Selectmen. b. If an employee wishes to waive his rights to details, he must sign a waiver to that effect and will not be asked until he wishes his name to be put back on the list, and he will not be called until they start at the top again. *Other Provisions:* (1) All shift assignments of regular employees shall be made in accordance with preference expressed in writing with respect to rank and seniority. (2) No employee shall be assigned to more than one shift, and employees shall not be required to work a shift other than the one which they are assigned, except in an emergency or as an overtime assignment. (3) All assignments to shifts shall be posted in the Police Station. *Article 12 Vacations:* . . . Vacation shall be granted in accordance with the seniority provisions of this agreement. Each employee shall be permitted vacation leave at such times during the vacation year he may request. In instances where an employee can not be granted vacation at the time he requests, he shall be given the reason(s) for denial in writing and shall have the right to use the grievance procedure if he is aggrieved. Vacations shall be picked by April 1st." "*Article 17 Personnel and Training:* 1. Establishment of the position of Personnel and Training Officer to be appointed by the Board of Selectmen and to be responsible for personnel files and a training program for all officers. This is in addition to regular duties. 2. The establishment of rules and regulations for all police officers of the Dracut Police Department, set up by the Chief and approved by the Board of Selectmen. 3. A program to be set up under the direction of the Personnel and Training Officer to send at least one officer per year to specialized school other than that which is required by statute. 4. Establishment of a proper uniform requirement, which is to include weapons. *Article 18 Extra Paid Details:* 1. Such assignments shall be made by the Chief or his representative by seniority as provided in the Seniority Section of this Contract. The Chief shall maintain a record of all such assignments, which may be examined at any time by a representative of the Association. No officer or other person shall accept any such assignment unless the same is made by the Chief or his representative. 2. No such assignment shall be made until the person or organization requesting services has agreed to pay a minimum of three (3) hours reporting time and at all times paying no less than $3.00 per hour. *Article 19 Responsibility and Morale:* 1. That the keys to the files in the Police Department be held by the officer in charge of each shift and those keys to be given in hand to the relieving officer in charge of the next shift. 2. The establishment of an officer under the direction of the Chief in charge of property to be called the Personnel Officer. His responsibilities are as follows: a. Property found, recovered, stolen, lost or confiscated, etc. b. Keep the keys to the room set aside for same. c. Keep a log separate on same. d. Supervise the yearly auction, as required by statute. e. In charge of all outside work details. f. Responsible for the proper maintenance of vehicles and equipment."

are not subject to § 97A or any other comparable limitations on the authority to assign and control their personnel.

The paramount concern of the chief in assigning his officers to their respective duties must be the interest and safety of the public, and, to some degree, the safety of the officers themselves, not the personal preference of each officer. In making assignments the chief must exercise his own discretion and judgment as to the number, qualifications and identity of officers needed for particular situations at any given time. He clearly has been given that authority by § 97A, and we cannot believe that the Legislature, in enacting provisions for collective bargaining by municipal employees, meant to take that authority away from the chief and permit the selectmen to bargain it away under the guise of negotiations on "wages, hours and other conditions of employment." To deprive the chief of his authority to assign his officers to their respective duties and to substitute therefore the disputed provisions of the agreement would be totally subversive of the discipline and efficiency which is indispensable to a public law enforcement agency. Thus, we conclude that those articles of the agreement which impinge upon the power and authority of the chief to decide duty, vacation and leave assignments are null and void as to members of the police department.[5] What we have said above may not necessarily apply to agreements covering employees of other municipal departments.

Certain other provisions of the agreement are void because they conflict with specific sections of the General Laws. In such a situation it is provided by G. L. c. 149, § 178I, that the law shall prevail over the agreement.

(a) Article 17, par. 2, of the agreement provides for

---

[5] Additionally, there may be a degree of conflict between article 12 and G. L. c. 41, §§ 111A and 111D, as to the fixing of vacation periods. General Laws c. 41, § 111, provides that vacations to municipal employees other than policemen and firemen "shall be granted by the head of the respective department of the city or town at such time as in his opinion will cause the least interference with the performance of the regular work of the city or town." Section 111A contains almost identical language applicable to policemen and firemen. Section 111D which is applicable in the town of Dracut is simply a liberalization of the vacation benefits provided in § 111A.

"[t]he establishment of rules and regulations for all police officers of the Dracut Police Department, set up by the Chief and approved by the Board of Selectmen." The authority of the chief to make rules is contained in G. L. c. 41, § 97A. By that statute the rules made by the chief may take effect under certain circumstances without the approval of the selectmen. The selectmen are without authority to change that by agreement with the association.

(b) Article 17, par. 4, provides for the "[e]stablishment of a proper uniform requirement, which is to include weapons." This provision as to weapons is in direct conflict with G. L. c. 41, § 98, which provides that police officers "may carry within the commonwealth such weapons as the chief of police or the board or officer having control of the police in a city or town shall determine." The chief is the "officer having control of the police" in Dracut by virtue of § 97A. Thus the provision of the agreement as to weapons conflicts with the statute, and the latter shall prevail.

There are several disputed provisions of the agreement which we hold are properly within the collective bargaining authority of the selectmen, subject to certain stated limitations.

(a) Article 5 requires the chief to "maintain a complete record of all overtime and sick leave accumulation," and to make the records and information therefrom available to the association. The last paragraph of article 11 requires that "[a]ll assignments to shifts shall be posted in the Police Station." It is inconceivable that the police department should not keep such records in the ordinary course of its affairs. The selectmen may properly agree with the association that it will be furnished with such records or information.

(b) Article 7 provides that members of the police department shall be granted one leave of absence without pay once every five years for a period not to exceed one month, subject to extension to a total up to ninety days. These leaves may be granted for "any reasonable purpose." "At [the] discretion of [the] employer," which is the town, there may be more than one every five years. The number

of men on leave at one time is to be "at [the] discretion of [the] employer." In each case "[r]easonable purpose" is to be agreed upon by the association and the employer. The provisions of the agreement, which allow leaves of absence without pay, and which determine their length and frequency, involve matters of policy properly within the authority of the selectmen to negotiate on "conditions of employment" and they do not conflict with any law. But, we reiterate that under § 97A the chief has the sole authority to assign officers to duty, and therefore he alone has authority to decide when leaves will be granted, how many officers will be permitted to be on leave at one time, and whether any officer may have more than one leave within five years. The selectmen may negotiate a contract specifying what shall constitute a "reasonable purpose" for granting a leave, but they have not done so. They may not by contract reserve to themselves the right to fix leaves and by the exercise thereof effectively interfere with the chief's sole authority to assign officers.

(c) Article 16 establishes a detailed procedure for the processing of grievances. It defines a "grievance" as "a complaint by an officer or a group of officers that is based upon an alleged violation of, or an alleged variation from, the provisions of this contract, or the interpretation, meaning or application thereof." To the extent that the selectmen have authority to bargain and contract on wages, hours and conditions of employment, they may also include in the contract a procedure for processing grievances arising solely under the contract itself. As thus limited, article 16 does not exceed the authority of the selectmen. However, it is clear that such procedures cannot be required by the contract to apply to alleged grievances arising from any action which the chief is authorized to take under § 97A.

The final decree entered in the Superior Court declared certain provisions of the collective bargaining agreement between the town and the association to be null and void, and it enjoined the defendants from enforcing and implementing those provisions. We have held above that several

of those provisions are valid. The final decree must therefore be modified accordingly. Paragraphs 5 and 7 of the final decree are to be modified by striking out the following language now appearing in each such paragraph: "Articles 4, 5, 7, that portion of Article 11 (2 through end), the second and third paragraphs of Article 12, Article 16, 17, and 19 of the Collective Bargaining Agreement," and by substituting therefor in each such paragraph the following: "Article 4, that portion of Article 7 after the word 'years' in the second sentence thereof, that portion of Article 11 consisting of the paragraphs numbered (2) and (3) under the heading of 'Seniority,' and the paragraphs numbered (1) and (2) under the heading of 'Other Provisions,' the second and third paragraphs of Article 12, Article 17, that portion of Article 18 consisting of the first and third sentences of paragraph 1 under the heading of 'Extra Paid Details,' and Article 19 of the Collective Bargaining Agreement."

The final decree, modified as required above, is affirmed.

*So ordered.*