**ACE–ALKIRE FREIGHT LINES, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**LOWERY TRUCKING COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 19817, 19821.

United States Court of Appeals,
Eighth Circuit.

Aug. 14, 1970.

John R. Phillips, Austin, Grefe & Sidney, Des Moines, Iowa, for petitioner Ace-Alkire; J. R. Austin, Des Moines, Iowa, on the brief and reply brief.

Clayton H. Shrout, Shrout, Lindquist, Caporale, Brodkey & Nestle, Omaha, Neb., for petitioner Lowery Trucking Co.

Morton Rosenberg, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Eugene B. Granof, Atty., N.L.R.B., on the brief.

Before MEHAFFY, HEANEY and BRIGHT, Circuit Judges.

HEANEY, Circuit Judge.

This case comes to us on the petitions of Ace-Alkire Freight Lines, Inc., and Lowery Trucking Company to review an order of the National Labor Relations Board and on the petition of the Board to enforce its order.

The Board's decision and order are reported at 177 N.L.R.B. 7 (1969).

Ace is a common carrier. Lowery is engaged in the business of leasing trucks to carriers. Lowery leased refrigerated trucks to Ace for use on a Chicago-Omaha run. In August, 1967, Local 710 of the International Brotherhood of Teamsters solicited applications for membership in the Union from the drivers of the leased trucks. By February 29, 1968, a majority of the drivers had signed application cards. The Local wrote to Ace on that date seeking recognition by card check or election. Ace responded by claiming that Lowery, not Ace, employed the drivers. Local 710 then picketed Ace trucks at all Chicago stops. Ace and Lowery responded by engaging in a series of acts and statements which resulted in a majority of the drivers signing a petition to withdraw their signatures from the application cards.

The Union filed unfair labor practice charges with the Board and requested that it be designated as the bargaining agent of the employees.

The Board found (1) that Ace and Lowery were joint employers; (2) that Ace violated Section 8(a) (1) of the Act by threatening the drivers with closure of its meat hauling operation and by promising and granting increased economic benefits in order to interfere with their choice of a bargaining representative; (3) that Lowery violated Section 8(a) (1) of the Act by threatening the drivers with economic reprisals for insisting upon their right to bargain collectively and by granting them a wage increase for the purpose of discouraging membership in the Union;

(4) that Ace and Lowery violated Sections 8(a) (5) and (1) of the Act by refusing to bargain with the Union after it had been designated as the bargaining agent of a majority of the employees in an appropriate unit, by bargaining with the employees directly, and by unilaterally instituting economic changes; and (5) that the unfair labor practices had the effect of undermining the Union's majority and that their nature was such as to preclude the holding of a fair election.

The Board ordered Ace and Lowery to cease and desist from engaging in the unfair labor practices found and from interfering with, restraining, or coercing their employees in the exercise of the employees' protected rights. It ordered Ace and Lowery to recognize and to bargain collectively, upon request, with the Union, and to post appropriate notices.

Ace and Lowery contend on appeal that they were not joint employers, each taking the position that the other was the sole employer. They also argue that neither violated Section 8(a) (1) of the Act. Ace separately contends that it should not be cited for refusing to bargain because (1) the application cards did not explicitly authorize the Union to represent the signers in negotiations, (2) the unit requested by Local 710 was inappropriate, (3) the Local did not represent a majority of the employees in the unit, (4) material misrepresentations were made in soliciting applications, and (5) a majority of those signing application cards withdrew their authorization in a timely manner. Lowery separately contends that it should not be found to have refused to bargain because Local 710 never requested it to bargain.

Ace contends alternatively that the unfair labor practices did not have a tendency to undermine the Union's majority strength and impede the election process, and that the order to bargain is, therefore, not proper.

■ The record supports the Board's findings that Ace and Lowery were joint employers. Both shared in the hiring process and both exercised control over the manner in which the men performed their duties. Lowery conducted the initial employment interview and sent those it found to be satisfactory to Ace. Lowery set and paid the drivers' wages and fringe benefits, made the necessary withholdings for various units of government, and was ultimately responsible for the drivers adhering to ICC regulations. Ace set the minimum age and experience requirements, retained the right to reject drivers sent to them by Lowery, exercised the right to discharge unsatisfactory employees, dispatched the drivers and monitored ICC logs prepared by the drivers. See, S. S. Kresge Company v. N.L.R.B., 416 F.2d 1225, 1230–1231 (6th Cir. 1969); N.L.R.B. v. Greyhound Corp. (So. Greyhound Lines Div.), 368 F.2d 778, 779–780 (5th Cir. 1966).

■ The record also supports the Board's finding that both employers violated Section 8(a) (1) of the Act. About one month after the Union sought recognition from Ace, officials of Ace and Lowery called a general meeting of the drivers at the Lowery Terminal. The drivers were asked to voice their complaints. Len W. Easter, the President of Ace, expressed surprise at the fact that drivers were not receiving five dollars for overnight layovers in Chicago. He told three employees after the general meeting that he would close the Chicago-Omaha meat haul before dealing with Local 710. Following the meeting, a petition, typed by a Lowery stenographer, demanding that the names of the signers be withdrawn from the Union application cards, was circulated among the drivers with the assistance of Lowery's dispatcher. Ten of the fourteen drivers who had signed application cards signed the petition. On the same day, a driver who asked to be assigned to a truck leased to a company other than Ace, while the Chicago to Omaha run was shut down, was told by Ruth Low-

ery, a partner in the firm, that his request could not be honored because he was a union sympathizer. A day or so later, Ruth Lowery told another driver that if Ace discontinued the Chicago-Omaha haul, drivers who had been on that run could look for another job because they wouldn't be assigned to other Lowery-owned trucks. Shortly before April 9, 1968, Ace and Lowery agreed that the drivers would be paid for Chicago layovers. The layover pay and an increase in driver compensation of one-fourth cent per mile was put into effect by Lowery shortly thereafter. Len Easter's threat to end the Chicago-Omaha operation and Ruth Lowery's statements that drivers who had signed cards would not be considered for other Lowery runs were coercive and violative of Section 8(a)(1) of the Act. N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 618–620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 274, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); Marshfield Steel Company v. N.L.R.B., 324 F.2d 333, 335–336 (8th Cir. 1963). Ace and Lowery also violated the Act by implicitly promising the drivers that they would be given layover pay if they discontinued their Union activities and by granting this benefit, and a one-fourth cent per mile increase to the drivers after they signed the withdrawal petition. See, N.L.R.B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); N.L.R.B. v. Grand Foundries, Inc., 362 F.2d 702, 708–709 (8th Cir. 1966).

We find no merit in Ace's contentions: (1) It is settled that an application for Union membership implies authority to bargain. National Labor Rel. Bd. v. Consolidated Mach. Tool Corp., 163 F.2d 376, 378 (2nd Cir.), cert. denied, 332 U.S. 824, 68 S.Ct. 164, 92 L.Ed. 399 (1947); Lebanon Steel Foundry v. National Labor Rel. Board, 76 U.S.App.D.C. 100, 130 F.2d 404, 407, cert. denied, 317 U.S. 659, 63 S.Ct. 58, 87 L.Ed. 530 (1942). (2) The unit of Ace-Lowery drivers on the Chicago-Omaha run is an appropriate one. Unit determinations by the Board are entitled to great weight and are "rarely to be disturbed." Packard Motor Car Co. v. National Lab. Rel. Bd., 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); N.L.R.B. v. William J. Burns Internat'l Dectective Agency, Inc., 346 F.2d 897, 900 (8th Cir. 1965). There is no reason to disturb them here. The drivers in question constituted a readily identifiable group and were the only drivers jointly employed by Ace and Lowery. They had similar duties and skills; they drove the same type of refrigerated equipment on the same Chicago-Omaha run. While other units might have been appropriate, there was nothing arbitrary or unreasonable about the Board's finding that this was an appropriate one. (3) Local 710 represented a majority of the employees in the unit found to be appropriate. There were at most fourteen employees on the Ace-Lowery payroll during the critical period February 29, 1968, to April 9, 1968. If every challenge of any merit be recognized, at least eight of the fourteen drivers had designated Local 710 as their bargaining agent. (4) No material misrepresentations were made in securing the application cards. The cards were unambiguous and were devoid of any implication that they were to be used solely for the purpose of obtaining an election. Furthermore, the record fails to support the employer's claim that Union organizers made oral representations of this nature to employees who signed the cards. See, N.L.R.B. v. Gissel Packing Co., *supra*, 395 U.S. at 606, 89 S.Ct. 1918. Nor were the cards used for a "different purpose than that for which they were solicited." Even though the Union organizer referred to Ace when he secured the cards and did not tell the employees that joint bargaining with Ace and Lowery would be attempted, it is clear that the employees were authorizing Local 710 to bargain about the job they then held. The trial examiner correctly observed, "What was in fact important to the employees, and their purpose in signing the

cards, was to obtain the benefits of collective bargaining, whether with Ace, with Lowery Trucking, or with both, about the jobs they then held." (5) The loss in majority was attributable to the employer's unfair labor practice, therefore, the Union does not lose its representative status. N.L.R.B. v. Gissel Packing Co., *supra;* Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); N.L.R.B. v. Decker, 296 F.2d 338, 342 (8th Cir. 1961).

### THE REMEDY

The order to bargain was an appropriate one in the light of the teachings of N.L.R.B. v. Gissel Packing Co., *supra* 395 U.S. at 614-615, 89 S.Ct. 1918. Ace and Lowery committed unfair labor practices which dissipated the Union's strength and impeded the election process. As a direct result of the statements of Ace and Lowery officials, most of the drivers signed the petition seeking to have their names withdrawn from the application cards. Improvements in wages and benefits were made shortly after the withdrawal. To conduct a fair election under such circumstances would be impossible. Noll Motors, Inc., 180 N.L.R.B. No. 60, 73 LRRM 1036 (1969); International Harvester Co., 179 N.L.R.B. No. 124, 72 LRRM 1467 (1969).

Lowery's contention that it should not be required to bargain because it was not formally served with a request to bargain by Local 710 is without merit. It knew that the Union claimed to represent a majority of the drivers on the Chicago-Omaha run and that it was seeking to bargain for them. Its officials were present at the March 27 meeting at which the drivers presented grievances. Thereafter, it threatened the employees and participated with Ace in granting the employees additional benefits. Under such circumstances, it was proper for the Board to require that Lowery, as well as Ace, recognize the Union and bargain with it.

The Board's petition for enforcement is granted.